NOTICE:  All slip opinions and orders are subject to formal
revision and are superseded by the advance sheets and bound
volumes of the Official Reports.  If you find a typographical
error or other formal error, please notify the Reporter of
Decisions, Supreme Judicial Court, John Adams Courthouse, 1
Pemberton Square, Suite 2500, Boston, MA, 02108-1750; (617) 557-
1030; SJCReporter@sjc.state.ma.us

22-P-803                                              Appeals Court


    JOHN McLAUGHLIN  vs.  ZONING BOARD OF APPEALS OF DUXBURY.[1]


                        No. 22-P-803.

        Suffolk.     March 1, 2023. - July 6, 2023.

        Present:  Green, C.J., Blake, & Englander, JJ.


Zoning, Appeal, Board of appeals:  decision, By-law, Judicial
    review, Littoral property, Special permit, Wetlands.
    Environment, Coastal wetlands.  Beach.  Department of
    Environmental Protection.  Municipal Corporations, By-laws
    and ordinances.  Practice, Civil, Zoning appeal.




    Civil action commenced in the Land Court Department on
February 26, 2019.

    The case was heard by Kevin T. Smith, J.


    Amy E. Kwesell for the defendant.
    Paul J. Driscoll for the plaintiff.
    Daniel C. Hill & Dennis A. Murphy, for Friends of the
Bluefish River, amicus curiae, submitted a brief.

───────────────────

        [1] The town of Duxbury was named as a defendant in the
complaint, but was dismissed without prejudice.

BLAKE, J.  Having concluded that a proposed residential pier would not extend the full distance over a salt marsh to access the water's edge as required by the town of Duxbury's zoning bylaws (zoning bylaws), the defendant, the Duxbury zoning board of appeals (board), denied the application of the plaintiff, John McLaughlin (plaintiff or McLaughlin), for a special permit.  A Land Court judge concluded that this case presents one of those "rarely encountered points," Britton v. Zoning Bd. of Appeals of Gloucester, 59 Mass. App. Ct. 68, 74-75 (2003), where no rational view of the facts (as found by the trial judge) supported the board's conclusion, and ordered the board to issue the special permit.  Because the judge's careful and detailed findings, conclusions, and analysis are amply supported by the record, we affirm so much of the judgment that annuls the board's denial of the special permit; however, rather than order the board to issue the special permit, we vacate the remainder of the judgment, and remand for entry of orders consistent with this opinion.[2]

---

[2] We acknowledge the amicus brief submitted by Friends of the Bluefish River.  The amici are residents of Duxbury and include abutters to the site of the proposed pier.  They unsuccessfully sought to intervene in the Land Court case, but did not appeal from the denial of their motion and therefore that issue is not before us.

Background.  As relevant here, section 404.20 of the zoning bylaws (section 404.20) requires that a pier "must extend the full distance over any salt marsh used to access the water's edge."[3]  The parties disagree as to whether the proposed pier complies with this requirement.  There is no dispute that the proposed pier will extend over the grassy, vegetated area of the salt marsh and that the float at the end of the pier will rest in the water -- at least at high tide.  Accordingly, the plaintiff's contention that the pier reaches the water's edge after crossing "the full distance" of the salt marsh is sound.  The board nevertheless maintains that even though the pier reaches the water in this manner, it still does not satisfy section 404.20, because the inlet where the float will be located should be considered part of the salt marsh.  According to the board, this inlet is part of a tidal creek and because State wetlands regulations provide that a salt marsh "may" include "tidal creeks," see 310 Code Mass. Regs. § 10.32 (2014), the board argues that the pier will terminate within the salt marsh, regardless of whether it has reached the water's edge. By contrast, the plaintiff contends that the inlet is not a

---

[3] As discussed in more detail infra, the terms salt marsh and water's edge are not defined in the zoning bylaws.

tidal creek but instead is a tidal flat that lies outside the bounds of the salt marsh.[4]

Summary judgment narrowed the issues, but the judge concluded that there was a material fact dispute -- whether the pier would extend the full distance over the salt marsh and terminate in a tidal flat or whether it will terminate in a tidal creek. Thus, as stated by the judge, the question posed for trial was as follows: "Is the area where the Pier[5] is designed to land a 'tidal creek' and, therefore, part of the salt marsh, or a 'tidal flat' which exists beyond the salt marsh?" In order to resolve this question, among other things, the judge heard testimony from opposing expert witnesses and took a view of the site. Because the judge's decision turns in large part on his factual findings, our review requires us to set forth the facts in some detail, all of which are drawn from the judge's findings and the trial exhibits, "supplemented by undisputed facts of record." Wendy's Old Fashioned Hamburgers

---

[4] As discussed infra, a salt marsh generally is defined by its vegetation. The board makes no claim that the area where the float is to be located includes salt marsh species.

[5] Section 6.0 of Duxbury's wetlands regulations, adopted by its conservation commission, defines "pier" as "the entire structure of any pier, dock, wharf, walkway, bulkhead or float, and any part thereof including pilings, ramps, walkways, floats and/or tie-off pilings attached to the shore."

of N.Y., Inc. v. Board of Appeal of Billerica, 454 Mass. 374, 375 & n.3 (2009) (Wendy's).

1.  The property and special permit application. McLaughlin owns property that sits on the Bluefish River, a tidal river within Duxbury Bay, and portions of his property are subject to the tide cycles of the Atlantic Ocean.  The property is improved with a home on its western end, and a vegetated salt marsh projects in an easterly direction from a coastal bank and railroad tie wall in the rear of the home.  To the north of the vegetated salt marsh is the inlet at issue, which is quite wide at its eastern end where it joins the open Bluefish River, and narrows gradually as it proceeds west, toward the house.  On the northern side of the inlet is another vegetated salt marsh. Aerial photographs of the general area show finger-like projections of salt marsh, separated by very narrow inlets of water ending a considerable distance before the upland area.[6] The exception is the inlet at issue on McLaughlin's property, which is substantially wider than the other inlets, narrows at its westerly end, and terminates closer to, but still many feet from, the railroad tie wall and the upland area of the property.

---

[6] Section 570.2 of the zoning bylaws defines upland area as "[a]ll lands not defined herein as wetlands."

In May 2018, McLaughlin filed an application for a special permit (application) with the board to construct a pier on his property, consisting of a 198-foot elevated walkway, a twenty-foot ramp, and an eight-foot by twenty-foot float.[7] The area where the walkway would cross is a grassy, vegetated marsh. Rather than extending to the eastern end of the salt marsh (a distance that would exceed 200 feet), the plans submitted with the application depicts the pier taking a jog to the north and ending in or near the widest part of the inlet, such that the float at the end of the pier would rest on what is labeled a tidal flat on the plans. The tidal flat area fills with seawater at high tide and empties at low tide, leaving a muddy area. Approximately forty feet west of the float (toward the house), the plans indicate the presence of a tidal creek. The tidal creek notation coincides with where the inlet begins to narrow as it continues toward the west.

2. Applicable regulations and definitions. Duxbury's zoning bylaws contain a wetlands protection overlay district (WPOD), article 404, the purpose of which "is to afford

---

[7] McLaughlin's application for a special permit followed protracted proceedings before the Duxbury conservation commission, which issued an untimely denial, and ultimately culminated in a superseding order of conditions issued by the Department of Environmental Protection (DEP), approving the project on May 24, 2016. McLaughlin submitted substantially the same plans approved by DEP to the board in support of his application for a special permit.

safeguards for both the coastal and inland wetlands located within" Duxbury.  McLaughlin's property is located in the WPOD. The proposed pier (sometimes referred to as project) is a use allowed by special permit in the WPOD pursuant to section 406.6(1) of the zoning bylaws.

The question whether the proposed pier extends the full distance over the salt marsh used to access the water's edge requires us to review the applicable regulations and definitions and we set them out here to facilitate later discussion. Section 404.20 of the zoning bylaws specifically addresses the "suitability of residential piers."  At issue is section 404.20(2), which provides that such piers "shall not exceed two hundred (200) feet in length and must extend the full distance over any salt marsh used to access the water's edge" (emphasis added).[8]  The term salt marsh is not defined in the zoning bylaws, but the judge concluded that the board's use of the definition contained in 310 Code Mass. Regs. § 10.32 was reasonable and McLaughlin does not contend otherwise on appeal. This is consistent with the long-standing principle that the meaning of undefined words is determined according to their common and approved usages in other legal contexts.  See Pelullo

---

[8] Section 404.20 contains other size, materials, and locational requirements, all of which the board concluded the proposed pier satisfied; they were not at issue at trial.

v. Croft, 86 Mass. App. Ct. 908, 909 (2014). See also Langevin v. Superintendent of Pub. Bldgs. of Worcester, 5 Mass. App. Ct. 892, 892 (1977). That definition provides that a salt marsh "means a coastal wetland that extends landward up to the highest high tide line . . . , and is characterized by plants that are well adapted to or prefer living, in saline soils." 310 Code Mass. Regs. § 10.32(2). The definition further provides that "[a] salt marsh may contain tidal creeks, ditches and pools."[9] Id.

Tidal creek is not defined in the zoning bylaws, local wetlands regulations, the Wetlands Protection Act, or any other regulatory source. Creek is defined in 310 Code Mass. Regs. § 10.04 (2014) as "the same as a stream"; the same regulation defines stream as "a body of running water, including brooks and creeks, which moves in a definite channel in the ground due to a hydraulic gradient, and which flows within, into or out of an Area Subject to Protection under M.G.L. c. 131, § 140. A portion of a stream may flow through a culvert or beneath a bridge."

---

[9] The judge and the parties have adopted an interpretation of the definition of salt marsh under which all tidal creeks are considered part of the salt marsh. Given the use of the term "may," that interpretation is not compelled. However, no party suggests that the interpretation is unreasonable and in the absence of a legal argument to the contrary, we accept that interpretation for the purposes of this appeal.

McLaughlin's plans label the portion of the inlet where the float will lie as a tidal flat. A tidal flat is defined as "any nearly level part of a coastal beach which usually extends from the mean low water line landward to the more steeply sloping face of the coastal beach . . . ."[10] 310 Code Mass. Regs. § 10.27(2). And, finally, a coastal beach "means unconsolidated sediment subject to wave, tidal and coastal storm action which forms the gently sloping shore of a body of salt water and includes tidal flats. Coastal beaches extend from the mean low water line landward to the dune line, coastal bankline or the seaward edge of existing human-made structures, when these structures replace any one of the above lines, whichever is closest to the ocean." Id.

3. The board's decision. Despite the absence of a definition of tidal creek, the board concluded in essence that the inlet is a tidal creek, and that because tidal creeks are included in the definition of salt marsh, the project as proposed impermissibly terminates in the salt marsh. The board concluded that although the pier met all other applicable criteria of zoning bylaw sections 404.20 and 906.2 (the general

---

[10] "'[T]idal flats' . . . refer to 'the area between mean high water and mean low water.'" Arno v. Commonwealth, 457 Mass. 434, 436 (2010), quoting Opinion of the Justices, 383 Mass. 895, 902 (1981).

special permit section of the zoning bylaws), it did not meet the requirement that the pier "extend the full distance over the salt marsh."  Specifically, the board credited the conclusion of the Duxbury conservation commission (commission) that the pier "ends within a narrow tidal creek in the salt marsh and never reaches open water."  It therefore denied the application.

The board expressly rejected the opinion of its peer reviewer (who opined that the pier complies with section 404.20[2]) because the peer reviewer indicated "that it had not reviewed or confirmed the existence or scope of the marsh." Instead, the board relied on the recommendation of the commission and the opinion of Lenore White,[11] a wetland scientist who testified before the board.  Although the commission had lost its jurisdiction to enforce the local wetlands protection bylaw because it issued its decision on the project late, the commission weighed in on the special permit application, as is contemplated by the zoning bylaws.[12]  The commission recommended

---

[11] White first became involved in 2013 when, on behalf of a group of townspeople, she provided comments in opposition to the project before the commission.  She testified on behalf of her clients in opposition to the application before the board and was hired by the board after McLaughlin appealed from its decision.

[12] Section 404.8(1) of the zoning bylaws provides that the board "shall refer a special permit application to the Conservation Commission, the Duxbury Bay Management Commission, the Board of Health, and the Planning Board for written comments

that the board deny the special permit, reasoning "that the design of the pier is unlike any other pier that has been permitted in Duxbury because the structure ends within a narrow tidal creek in the salt marsh and never reaches open water."[13] The board credited the commission's recommendation and noted that (i) there is "nothing in the zoning Bylaw that requires [the] board to ignore the recommendations of the commission . . . simply because" the Department of Environmental Protection (DEP) had issued a superseding order of conditions,[14] and (ii) it found "no reason to depart from the commission's recommendation with respect to whether the proposed Pier extends the full distance over the 'salt marsh.'"

The board also relied on the expert testimony of White, who, the board said, "testified at the public hearing that the proposed Pier ended in a tidal creek that was itself part of the salt marsh and that the resource delineation lines reflected in [McLaughlin's] plan were unreliable." The board found that

and recommendations before taking final action on said special permit application."

[13] The commission also expressed concerns about negative impacts on the salt marsh and the public's view. The board, however, did not mention these concerns in its decision; rather it found that the site is suitable for a pier, the pier will not harm natural habitats or valuable natural vegetation, and "[s]cenic views from public ways and developed properties have been considerately treated."

[14] Neither party pursues this issue on appeal.

McLaughlin's delineation between the tidal creek and tidal flat was less credible than White's testimony that the pier ends in the salt marsh.

4.  The Land Court decision.  The judge took a view of the site and conducted a two-day trial.  He heard testimony from experts for both parties on the issue whether the pier is designed to terminate in a tidal creek, which is part of the salt marsh (and therefore is not in compliance with the zoning bylaws), or in a tidal flat, which extends to the water's edge at high tide (and therefore is in compliance with the zoning bylaws).  Complicating the judge's task was the fact that neither the zoning bylaws nor wetlands regulations define the term tidal creek.  Indeed, the judge found that even where terms were defined, all of the experts agreed that the definitions in the DEP regulations for coastal resources have "problems" due to their age (and lack of updating) and may be subject to differing interpretations between wetland scientists.

In his decision, the judge first discussed the testimony of the two experts offered by McLaughlin:  Paul A. Brogna, the engineer who designed the project, and Robert M. Gray, a wetlands scientist.[15]  Both experts testified that the float at the end of

---

[15] The judge found that Brogna has been involved in the design and permitting of approximately sixty residential piers. He also found that Gray has been a certified wetland scientist

the pier would be situated over a tidal flat rather than a tidal creek. The judge credited Gray's testimony that a tidal flat is comprised of organic materials and is usually found adjacent to and at a lower elevation than the vegetation in a salt marsh. The judge credited testimony from both Brogna and Gray that tidal flats in the Duxbury area generally are between an elevation of 0 and 9.2-9.5 feet, consistent with the inlet at issue here.[16] Both experts testified that they could identify a tidal flat by sight, and the judge found that both conducted several site visits to verify what they saw on resource maps and plans with what they observed to be tidal flats on the site.[17]

Neither Gray nor Brogna had ever encountered a pier project where the presence of a tidal creek was at issue. Gray opined that the definition of creek and stream relied on by White

_____

since 1994 and since 1983 has provided consulting services for construction in and around wetland resource areas.

[16] The judge noted Gray's testimony that DEP essentially confirmed their delineation of a tidal flat, and found that "[a]lthough [it is] not binding on the Board or this court, it is certainly relevant that the DEP issued a superseding order of conditions approving construction of the Pier in the area shown on the project plans."

[17] The judge found that Brogna prepared a topographic plan which identified the natural features of the site, in part by reviewing "the United States Geological Survey entitled Duxbury Quadrangle 1974 . . . and a map maintained by the MassGIS [Bureau of Geographic Information within the Executive Office of Technology Services and Security] called the 'wetlands change map.'"

referred to fresh water because inland wetland regulations address land under creeks and streams. Gray further opined that there is no tidal creek on the plans because he observed no body of water originating in the upland area that flowed into the inlet "due to a hydraulic gradient" that would meet the definition of creek in 310 Code Mass. Regs. § 10.04.[18] In sum, according to Gray, a tidal creek "denotes a freshwater source that at some point in its flow seaward is influenced by the tide"; here, where there was no freshwater source, he opined that there was no creek, and, therefore, no tidal creek.

In contrast to Brogna and Gray, White opined that the inlet in which the float would be situated was a tidal creek, and thus was part of the salt marsh.[19] As a result, she concluded that the pier would not comply with section 404.20 requiring it to extend the full distance over the salt marsh. White offered two reasons for her opinion. First, she disagreed with the

---

[18] Gray testified that the delineation of a tidal creek on the plans was placed at the urging of the commission, and that he had made efforts to have it removed because in the absence of a regulatory definition of tidal creek, he could not support the continuing use of the terminology.

[19] The judge found that White is a certified wetland scientist who operates her own consulting business concerning design and permitting work in wetland resource areas; she previously had been employed by DEP for twenty years. She had conducted peer reviews for the Duxbury conservation commission approximately ten times in the two years prior to trial, in addition to conducting peer reviews for other conservation commissions.

designation of the tidal flat area on McLaughlin's plans because, in her view, Brogna and Gray had relied solely on maps that were unreliable for that purpose. Second, extrapolating from the definition of salt marsh and creek, White testified that the inlet area at the end of the pier fit the description of creek or stream. She further testified that the tidal flows alone -- into and out of the inlet area -- coupled with declining topography, met the definition of a "body of running water" for purposes of the regulatory definition of a creek. See 310 Code Mass. Regs. § 10.04.

The judge credited the testimony of Brogna and Gray, finding that their evaluations, in contrast to White's, "reflected a more detailed analysis" of the property and its coastal resources. The judge found that Gray and Brogna "consulted several databases, reviewed the regulatory definitions, inspected the property multiple times, and made determinations about the presence of wetlands resource areas based on years of relevant experience with construction along sensitive shoreline areas." Although White testified that the various maps relied on by the experts, herself included, were dated and were not reliable for delineation purposes on their own, the judge found that Brogna and Gray had verified that information with onsite inspections, unlike White, who had not made a site visit. In addition, the judge rejected White's

opinion that the inlet satisfied the regulatory definition of a creek or stream, finding her opinion "strained."  The judge noted that if White were correct, then any area subject to tidal flows would qualify as a tidal creek.  This would mean that the entire area depicted on the plans was a tidal creek, and that "there is no tidal flat in any area shown on the project plans," which, the judge found, is inconsistent with the delineation of tidal flat made by Brogna and Gray based on a process even White agreed should be conducted.  The judge also rejected White's opinion because she failed to conduct a site visit or an independent coastal wetlands delineation even though she considered it "the most important factor in properly delineating a coastal resource area"; her opinion suffered from deficits similar to those that caused the board to reject its peer reviewer's opinion, and "she appeared before the [b]oard as an advocate of a group of townspeople who opposed the project." The judge ultimately found White's testimony "unconvincing," and concluded that the pier "depicted on the project plans will end in a tidal flat which, at high tide, is the water's edge." Finally, the judge concluded that the board's decision was not subject to substantial deference because the board acted unfairly and without facts to support its decision and the denial of the special permit was "unreasonable, whimsical, capricious and arbitrary."

Discussion. "Judicial review of a zoning board's decision pursuant to G. L. c. 40A, § 17, 'involves a peculiar combination of de novo and deferential analyses.'" E & J Props., LLC v. Medas, 464 Mass. 1018, 1019 (2013), quoting Wendy's, 454 Mass. at 381. "The judge reviews the facts de novo without giving evidentiary weight to the board's findings, . . . and reviews with deference the board's legal conclusions within the authority of the board" (quotation and citation omitted). E & J Props., LLC, supra. "If the board's decision is supported by the facts found by the judge, it may be disturbed only if it is based on a legally untenable ground, or is unreasonable, whimsical, capricious or arbitrary" (quotation and citation omitted). Fish v. Accidental Auto Body, Inc., 95 Mass. App. Ct. 355, 362 (2019). The board's decision will not be upheld, however, "where no rational view of the facts the court has found supports the board's conclusion." Wendy's, supra at 383.

"We accord deference to a local board's reasonable interpretation of its own zoning bylaw . . . with the caveat that an incorrect interpretation of a statute . . . is not entitled to deference" (quotation and citation omitted). Shirley Wayside Ltd. Partnership v. Board of Appeals of Shirley, 461 Mass. 469, 475 (2012). As we discuss below, in the circumstances of this case, judicial acceptance of the board's interpretation is not required. Cf. Warcewicz v. Department of

Envtl. Protection, 410 Mass. 548, 550 (1991) (agency interpretation of own regulation owed substantial "deference, not abdication").

1.  Expert opinions.  Here, the judge was faced with the assessment of the opinions of competing expert witnesses. "Faced with a battle of experts, the fact finder may accept one reasonable opinion and reject the other."  Delta Materials Corp. v. Bagdon, 59 Mass. App. Ct. 439, 441 (2003), quoting Fechtor v. Fechtor, 26 Mass. App. Ct. 859, 863 (1989).  To the extent the board argues that the judge erred in crediting the opinions of Brogna and Gray because they changed how they depicted the inlet through different iterations of the plans, the argument is unavailing.  Both were questioned on this issue at trial.  Gray explained the difficulty he had finding a regulatory definition that would allow him to "put some boundaries" on a tidal creek and the reasons he concluded that the area in which the pier terminates is a tidal flat.

The judge was free to accept or reject all or any part of this evidence.  See Epstein v. Board of Appeal of Boston, 77 Mass. App. Ct. 752, 760 (2010) (judge's province to assess credibility and weight of expert opinion).  The judge was satisfied with the explanation of the evolution of Brogna's and Gray's opinions.  As the record supports the judge's findings and conclusions, we will not disturb them on appeal.  See Bask,

Inc. v. Municipal Council of Taunton, 490 Mass. 312, 320 (2022) (trial judge's findings will only be set aside if clearly erroneous or there is no evidence to support them).

2. Coastal beach. The board next argues that the judge's finding that the pier ends in a tidal flat is clearly erroneous because tidal flat is defined as part of a coastal beach and in the absence of the upland or steeply sloping face of a coastal beach, there cannot be a tidal flat. The board contends, and its expert, White, testified, that there was no coastal beach delineated on the plans submitted with the special permit application and that the DEP did not check "coastal beach" as a resource area in its superseding order of conditions. White further claimed that salt marsh is not part of a coastal beach.

Rather than merely pointing out a potential technical omission on the plans or on the part of DEP, we construe the board's argument to be that the absence of the delineation of coastal beach on the plans and on DEP's superseding order of conditions is proof that a coastal beach simply does not exist and that we should conclude, therefore, that tidal flats could not exist in the area of the inlet, rendering the judge's conclusion that the pier terminates in a tidal flat clearly erroneous. We are not persuaded.[20]

---

[20] We note that the board's decision did not mention the absence of a delineation of coastal beach, nor has the board

The definition of coastal beach expressly includes tidal flats. See 310 Code Mass. Regs. § 10.27(2). The definition does not necessary exclude the existence of tidal flats without a steeply sloping face part of a coastal beach. The definition provides that "[c]oastal beaches extend from the mean low water line landward to the dune line, coastal bankline[,] or the seaward edge of existing human-made structures, when these structures replace any one of the above lines, whichever is closest to the ocean" (emphasis added). Id. The plans submitted with the application delineate the tidal flat, and delineate the "top of coastal bank" along the existing railroad tie wall on the McLaughlin property. Nothing in the definition suggests that a delineation between where the tidal flat ends, and the coastal bank begins, needs to be identified.

Moreover, when the board asked Brogna why a coastal beach was not shown on the plans, he testified that "[w]e didn't delineate it specifically as a coastal beach. We showed it as a

_____

pointed to a specific provision in the zoning bylaws that would require that delineation. Whether that was a requirement of the commission or DEP is not an issue before us. Moreover, the board is attempting to defend its decision on a ground that it did not articulate in the decision itself. See Costello v. Department of Pub. Utils., 391 Mass. 527, 536 (1984) ("we will not supply a reasoned basis for the [board's] action that the [board] itself has not given" [quotation and citation omitted]). Cf. Doe, Sex Offender Registry Bd. No. 11204 v. Sex Offender Registry Bd., 97 Mass. App. Ct. 564, 576 (2020).

tidal flat because a tidal flat is part of a coastal beach." He said that "[m]ost tidal beaches of Duxbury have sand. This area doesn't." Gray also testified that the coastal beach is "designated with the words tidal flats." Having concluded that the float rests on tidal flats, the judge implicitly credited this testimony. It bears repeating that in offering her opinion, White did not visit the site and conduct her own coastal wetlands delineation. Whatever significance may be inferred from the absence of a separate designation of coastal beach on the plans or on the superseding order of conditions, it does not compel a conclusion that there are no tidal flats where the pier will terminate. The board has not shown that more was needed in order to qualify for a special permit.

3. <u>Deference to the board</u>. The board also claims that the judge did not give it the deference to which it is entitled. The judge's duty was to make findings of fact de novo without deference to the board's findings. See <u>E & J Props., LLC</u>, 464 Mass. at 1019. Whether the float at the end of the pier would rest on the salt marsh or on a tidal flat was a question of fact and the subject of conflicting expert testimony which the judge resolved.

Contrary to the board's argument, the evidence before the board and before the judge was not "substantially similar." Having made very different credibility determinations based on

the experience of the experts, the number of times the experts viewed the area, and the level of detail and factual support in the experts' analyses, the basis for the judge's decision differed dramatically from that of the board.  In these circumstances, the judge did not "substitute his opinion" for that of the board; he drew reasonable conclusions based on different facts.

The judge's detailed findings refute the suggestion that the board made and applied a reasonable interpretation of the zoning bylaws, in reliance on the opinions of White and the commission, that was entitled to deference.  See Shirley Wayside Ltd. Partnership, 461 Mass. at 475.  Incorrect interpretations of the zoning bylaws are not subject to deference, and the judge's ultimate conclusion that the board incorrectly concluded that the pier would terminate in a tidal creek was supported by the record.  See id.  Moreover, the board's argument that the judge disregarded the commission's concerns that the float at the end of the pier would "harm and destroy the salt marsh," and substituted his judgment on that issue, is wholly unavailing. The board implicitly rejected the commission's concerns about impacts on the resource areas through its findings.  See note 13, supra.  Where the board itself did not rest its decision on the commission's concerns and implicitly rejected them in its findings, an accusation that the judge substituted his judgment

for that of the board is unfounded. This is not a case where the judge weighed the impacts of the pier on the salt marsh and came to a different conclusion from the board. Compare ACW Realty Mgt., Inc. v. Planning Bd. of Westfield, 40 Mass. App. Ct. 242, 247-248 (1996) (extent of traffic impacts on neighborhood was determination for board and judge should not have substituted his judgment); Kinchla v. Board of Appeals of Falmouth, 11 Mass. App. Ct. 927, 927 (1981) (when weighing whether noise generated by use of proposed pool would have adverse effect on neighborhood, judge could not substitute his judgment). In contrast, here, on the basis of conflicting expert testimony, the judge made a factual determination and concluded that the float at the end of the pier would end in a tidal flat which, at high tide, is the water's edge. The suggestion that the judge substituted his judgment on an issue subject to reasonable disagreement best left to the board is without support.

To the extent the board argues that it was entitled to deny the permit even if all of the statutory and regulatory criteria were met, see Clear Channel Outdoor, Inc. v. Zoning Bd. of Appeals of Salisbury, 94 Mass. App. Ct. 594, 600 (2018), there has been no showing here that the board purported to rely on that discretionary authority. See Wendy's, 454 Mass. at 387 (judge not obliged to search for facts to support rationale

board did not provide). Moreover, such discretion is not unlimited. See id. Cf. Costello v. Department of Pub. Utils., 391 Mass. 527, 535-536 (1984). Given the board's factual findings that the proposed pier satisfied all other requirements for the special permit and that it did not articulate a reason to exercise its discretion to nonetheless deny the special permit, we discern no abuse of discretion in the judge's decision to annul the board's decision.

4. Remand. Although we are generally "reluctant to order a board to implement particular relief," as was done here when the judge ordered the board to issue a special permit, "an order of particular relief may be appropriate where remand is futile or would postpone an inevitable result." Wendy's, 454 Mass. at 387-388. We understand why, where the judge annulled the only basis provided by the board for rejecting the application, the judge thought it proper to order the board to issue the special permit. The issuance of a special permit may well be inevitable where, "[o]n remand, a board may not ignore or disagree with the specific findings of a reviewing court after a judge has fulfilled her statutory duty to 'determine the facts.'" Id. at 389, quoting G. L. c. 40A, § 17. However, an order directing issuance of a permit is exceedingly rare, and the issuance of a special permit is not the only question at issue; because the board denied the special permit based on an incorrect

interpretation of the zoning bylaws, it had no occasion to consider whether reasonable conditions to a special permit would be appropriate to protect the interests targeted by the WPOD. Therefore, a remand is necessary to afford the board an opportunity to impose reasonable conditions on construction of the pier.  Contrast MacGibbon v. Board of Appeals of Duxbury, 369 Mass. 512, 520 (1976) (directing that order enter instructing board to issue special permit where board had denied application three times on legally untenable grounds).

Conclusion.  We affirm the judgment insofar as it annuls the board's decision to deny the application for a special permit.  We vacate so much of the judgment that orders the board to issue the special permit, and the case is remanded to the Land Court for entry of an order remanding the case to the board to expeditiously issue the special permit after considering whether imposition of reasonable conditions is warranted.[21]

So ordered.

---

[21] McLaughlin's request for attorney's fees and costs is denied as they are allowed against the board only where it has "acted with gross negligence, in bad faith or with malice." G. L. c. 40A, § 17.  Here, the board was faced with interpreting a local bylaw whose terms were not well defined.  Although we agree with the judge that the board's interpretation was not reasonable, we do not conclude that it was grossly negligent or made in bad faith or with malice.